DECISION
In this civil action the Attorney General and the Director of the Department of Environmental Management (DEM) by complaint filed on September 12, 1995, initially asked this Court to order the defendants (1) to cease and desist from adding any material to a tailings stockpile, referred to by the plaintiffs as a detail ends, stockpile, on their land, other than clean fill to encapsulate the stockpile with a two-foot earth cover; (2) to remove and dispose of the material then in the stockpile, re-covering the material in the stockpile each day while it is being removed, and never again to maintain more than one-day's material for processing on the defendants' site in an open stockpile.
More important, as the hearing progressed, the plaintiffs sought relief with respect to the defendants, storage activity. They further requested that the defendants be ordered to cease and desist from adding any material to three storage cells located on land belonging to them, except for cover material consisting of two feet of clean earth from off-site to encapsulate the cells, and that exposed portions of each cell be covered with six inches of clean earth each day. They also asked that the defendants be further ordered to operate their facility under supervision of DEM in such a way that the use of the storage cells would not create a public nuisance.
I.
The plaintiffs' complaint alleged that the defendants own and operate waste stockpiles in the Town of Johnston which are emanating smoke, odors and airborne toxic substances into surrounding residential neighborhoods. They claim that the operation of these waste stockpiles constitute a public nuisance and violate several statutes. The Attorney General asserts standing to bring the action under G.L. §§ 42-9-5 (suits by the State), 10-20-1, et seq. (environmental rights), 10-1-1, et seq. (abatement of nuisances), and as parens patriae, on behalf of residents of the State collectively. The Director asserts authority to bring this action under G.L. §42-17.1-2(a), § 23-18.9-1, et seq. (refuse disposal), §23-23-1, et seq. (air pollution), and § 46-12-1, et seq. (water pollution).
The defendant Louis Vinagro, Jr. (Vinagro) owns land in the Town of Johnston which the plaintiffs allege to be the site from which the smoke, odors and toxics emanate. The defendant New England Ecological Development, Inc. (NEED) conducts operations on a portion of Vinagro's land. These operations are alleged to be the source of the smoke, odors and toxics, which the plaintiffs claim constitute the nuisances and statutory violations. According to the plaintiffs, complaint the defendants collect and stockpile certain waste materials on their premises. From these stockpiles the offensive smoke and odor and other pollutants are said to emanate. One set of such stockpiles are three storage cells, in which construction and demolition debris can be retained for periods from one year up to three years. Another stockpile is described in the complaint as a "tail ends" stockpile, which the evidence disclosed to be a tailings stockpile, which was alleged to consist of accumulated waste material prepared for processing each day, but which had not yet been processed on that day. The plaintiffs complained that on several dates in January, February, August and September 1995, ". . . there has been smoke and odors emanating from numerous locations within the [tailings] stockpile and the storage cells, with accompanying strong burning/smoldering type odors present on-site and off-site."
The plaintiffs further complained that the smoke and odors pass beyond the bounds of the defendants, site and have caused nearby residents of Cranston and Johnston to suffer ". . . nausea, headaches, burning eyes and throat, and a disturbance of sleep . . ." The emissions, they alleged, ". . . are characterized by elevated levels of hazardous pollutants." In addition, it was alleged that there was, ". . . a high risk that a major conflagration may occur at the [tailings] stockpile and the storage cells exceeding and exacerbating the present smoldering conditions."
Finally, the plaintiffs alleged that the tailings stockpile comprised an unlawful landfill under pertinent statutes.
On September 15, 1995, after hearing, this Court issued a temporary restraining order prohibiting the defendant "from emitting any smoke, or anything that looks, tastes, smells, feels, or is otherwise describable as smoke, which crosses the bounds of his (sic) land." The matter was continued for hearing by affidavit, cross-examination and exhibits on preliminary injunction to commence on October 13, 1995. On October 12, 1995 the plaintiffs moved to adjudge the defendants in contempt of the September 13, 1995 order because smoke emanating from their premises crossed the boundaries of the defendants' premises. The Court deferred hearing on the contempt motion until the hearing on the application for a preliminary mandatory injunction.
On October 12, 1995 the defendants answered the plaintiffs' complaint. The defendants denied that any of their activities generated smoke, which crossed the boundries of their land. They asserted that they were actively engaged in the elimination of the tailings stockpile. The defendants acknowledged that they were engaged in storing demolition debris and wood waste in storage cells for at least one year as approved by DEM. They contended that a slight odor and venting of steam did ensue from the decomposition of the organic waste in the cells but that none of it traveled off defendants' premises.
As affirmative defenses the defendants alleged that they are not subject to G.L. §§ 23-18.9-1, et seq. (Refusal Disposal Act) because they do not operate a "Construction and Demolition Debris Processing Facility" as defined by that Act. They also contended that they are operating the three storage cells pursuant to a consent decree of this Court, which is a form of contract the impairment of which is constitutionally prohibited. The defendants also pleaded equitable defenses of estoppel and unclean hands.
Hearings on the plaintiffs' contempt motion, application for preliminary injunction and the motion to intervene by the Town of Johnston were not commenced until October 30, 1995. The Town was permitted to intervene in a limited capacity on November 14, 1995. On November 22, 1995 the plaintiffs moved for a further temporary restraining order to prevent the defendants from receiving any materials at their Johnston site and to require them to put a one-foot cover of virgin clay or gravel over areas of the storage cells or the tailings stockpile from which steam or smoke was then being emitted. Based on the affidavits and the emergent nature of the situation on that date the defendants were enjoined from any further receipt of any construction and demolition debris until an appropriate cover consisting of a one-foot layer of mostly virgin clay or gravel had been applied to all areas where smoke or steam was being emitted as well as other areas of the slopes and tops of the cells.
Hearings were held on November 14, and December 4, 6, 7, 8, 1995; and January 5, 10, 16, 18, February 5, 6, 7, 8, 12, 13, 14, 15, 29, and March 4, 11, 25, 1996. Final arguments were heard on May 1, 1996.
II.
RELATIVELY UNDISPUTED
BACKGROUND FACTS
The sources of the plaintiffs' complaint were shown by the evidence at the hearing to be two separate activities on the defendants' premises. The first of these was a tailings stockpile. The defendants removed decomposed construction and demolition debris from one of three storage cells where the debris had been decomposing for at least a year. This partially decomposed mostly organic material was brought to an installation where it was further processed to recycle it into a usable substance. Over a period of time the defendants had begun to accumulate more such material at the processing facility than could be processed in one day. The material was stockpiled in the open outside the processing facility. This tailings stockpile was eliminated by December 1995 in the course of this litigation.
The second source of the plaintiffs' complaint are three storage cells on the defendants' premises. These three storage cells for construction and demolition debris were authorized in a consent decree entered by this Court on October 5, 1990 inAnnarummo, Director vs. Louis Vinagro, Jr., et al., C.A. No. PC 90-5535. Paragraph 10.C. of that judgment provides: ". . . Vinagro shall submit a plan, pursuant to Section 10a and in accordance with Appendix B, for the construction of temporary recyclable material storage cells which will enable construction/demolition debris to be stored in a safe and efficient manner prior to processing. Particular attention shall be paid to proper fire prevention considerations. The three (3)cells shall each have an approximate volume of one (1) year'sprocessing capacity. In exchange, DEM shall allow Vinagro and NEED to begin the construction and use of the first storage cell immediately upon execution of this Agreement." (Emphasis added.)
Each of these storage cells is an otherwise open space surrounded by earthen mounds or berms. A drawing of typical cross sections of the cells and the surrounding berms appears in Attachment 12, to the October 12, 1995 affidavit of Leo Hellested (Plaintiffs' Exhibit 2). A typical berm was to have a cross-section base of 130 feet, more or less, in width, tapering upward to a top width of approximately 10 feet. The exterior slope of the berm was to consist of one foot of rise for each two feet of base, and the interior slope was to rise one foot for each foot of the base. The berm was to rise to a vertical height of approximately forty feet, but the underlying terrain could vary the height of the berm. The berms were approximately two hundred feet apart, and several hundred feet long. Each of the three cells was surrounded by a berm, but at least two of the cells shared one berm in common for the length of the cells. A graphic illustration of the concept may be found in a drawing labeled Recycling Facility: Site Plan No. 1" attached as part of Appendix C to Defendants' Exhibit G, "The Vinagro Companies Statement of Qualifications."
III.
THE EVIDENCE AT THE HEARINGS
The Plaintiffs' Case in Chief.
The plaintiffs, first witness was Leo Hellested, whose testimony was presented in three affidavits, dated September 12, October 12 and November 14, 1995, together with attached exhibits, and oral cross-examination on November 14, December 4, 6 and 7, 1995.
Mr. Hellested is a licensed professional engineer and land surveyor and was at all material times a supervising sanitary engineer in the division of waste management of the DEM. He had become familiar with site prior to his site visit on August 29, 1995.
On that date he visited the site with Mr. Ronald N. Gagnon, chief of the division, and Mr. Walid Ali, a sanitary engineer, in response to complaints about smoke and odors from nearby residents in Western Cranston and Johnston. During his inspection he observed smoke emanating from what he called a "Tail Ends" stockpile and "strong burning/smoldering type odors" on and off the site. During his inspection he went onto the premises of an adjoining operation, Liberty Disposal. From there he observed the smoke and odors emanating from the stockpile.
On September 8, 1995, after notice on the previous day, Mr. Hellested came into the vicinity of the site, together with Mr. Ali, and Ms. Kien Harris and Joseph Antonio, both air quality technicians from DEM's division of air resources. While observing from Shun Pike, he observed smoke emanating from both the tailings stockpile and numerous locations on the storage cells. He was denied access to the site on this date for air quality testing.
On September 14, 1995, this witness was in the vicinity of the defendants' site on other departmental business. He did not observe any smoke or odor emanating from the Jerry Macera facility, which the defendants have suggested is a likely source of smoke and odors. Driving along Shun Pike adjacent to the entrance to the Central Landfill, he detected no garbage or burning odors emanating from that facility. As he passed the defendants' facility, from Shun Pike he saw smoke emanating from a storage cell at eight different locations and detected burning/earthy odors. On that day he also eliminated the Macera Brothers Transfer Station as a source of the odors he then detected.
Then, on September 19, 1995, he responded to a complaint of smoke coming from the defendants, storage cells. From a garage adjacent to the defendants' site he observed "a couple of smoking areas within the storage cells located on the (defendants') property." As he drove along Shun Pike he counted six such areas and photographed one. See Attachment 3 to his affidavits, which clearly shows a wisp of smoke-like material rising from one of the berm-walls of a storage cell. On that same day, along with his co-worker, Mr. Ali, he visited a number of other potential sources of odor, but he observed no smoke or burning odor from any of these locations. That afternoon he photographed defendants, employees attempting to cover smoking areas by hand. See Attachment 4 to his affidavits.
On September 25, 1995, the defendants refused to allow Mr. Hellested and Mr. Ali to survey the elevations and slopes of the storage cell berms. On that date he observed large amounts of smoke emerging from many areas of the tailings stockpile.
The defendants eventually relented in their opposition to the survey and on September 27, 1995 the witness and his colleague performed a topographical survey and inspection of the berms. They found that in seven random locations the slope of the exterior of the berms exceeded the 2:1 ratio required by the plan submitted in compliance with paragraph 10.C. of the Consent Judgment entered on October 5, 1990 in Annarummo, Director, vs.Vinagro, et al., C.A. No. PC 90-5535. See Attachment 12 to his affidavits. In addition, he measured the height of the berm to be 52.9 feet, in excess of the approximately 40 feet shown on the plan. He noted that the exterior slopes were not vegetated. And, he observed a number of areas of severe erosion. Finally, he noted that the cells were capped with coarse wood chips and not the one-foot soil cap required by the plan. These wood chips are illustrated by Attachment 13 to his affidavit.
The witness collected official fire reports from the Johnston Fire Department from March 19 to September 19, 1995. Those records disclose that there were six occasions on which the department responded to the defendants' premises for fire and smoke incidents between August 11 and September 19, 1995.
On November 11, 1995, Mr. Hellested and Mr. Ali responded to a complaint of a "horrible burning type stench" which had persisted from the previous day in the Lincoln Drive area of the Town of Johnston. At that location he detected the "burning/earthy type stench" in the neighborhood. The wind direction was from the Shun Pike/Green Hill Road vicinity. The source of the stench was the defendants' facility, where "smoke/steam" was observed emanating from several locations within the storage cells. On inspecting the other potential sources of the odors in the area, including the Central Landfill, each was eliminated.
Mr. Hellested's observations were challenged on cross-examination, but his testimony that the defendants' storage cells were the source of smoke and odors was unshaken.
The evidence of Walid Ali was presented through two affidavits, dated September 12, and October 12, 1995, and cross-examination in open court. Mr. Ali had been a sanitary engineer in DEM's division of waste management for three years at the time of the hearing. He was also a registered engineer in training in Rhode Island. He had been a frequent regular investigator at the defendants, site since November 1992. During his inspections of the site on January 30, February 15 and 24, March 9 and May 26, 1995 he observed smoke emanating from the storage cells.
On August 11, 1995, in response to a complaint from the Shun Pike area, the witness observed heavy smoke emanating from the storage cells. He also detected objectionable odors beyond the defendants' property line.
When he returned to inspect the site on August 22, 1995, he observed that wood chips were being improperly used in an attempt to control erosion from the embankment berms.
On August 29, 1995, Mr. Ali observed smoke and burning/earthy odors emanating from the tailings stockpile. On that date, and on the next two, August 30 and 31, he eliminated other potential sources of odor in the vicinity as being the source of the odors giving rise to the complaints in the area.
On Friday, September 1, 1995, Mr. Ali conducted air quality sampling at the site, accompanied by personnel from the division of air resources of the DEM. During the testing he observed a flame smoldering out of the tailings stockpile.
On September 8, 1995, when Mr. Ali came to the site for further air quality sampling he observed smoke emanating from numerous locations in the tailings stockpile and the storage cells. This was the date when the defendants refused to allow DEM representatives to conduct air quality sampling.
This witness explicitly corroborated the observations of Leo Hellested on September 14 and 19, 1995. On September 20, 1995, Mr. Ali detected "earthy" odors while driving on Plainfield Pike in Johnston at 8:00 a.m. At the intersection of Plainfield Pike and Green Hill Road the earthy odors "became foul." As he drove along Green Hill Road that morning he saw a couple of "smoldering" areas at the edge of the storage cells. On Shun Pike he noted five different smoking locations in the storage cells. Finally, he made note of and photographed the lack of vegetative cover on the exterior slopes of the cells. See Attachments 1, 2, and 3 to his affidavit.
Once again, on the next day, September 21, 1995, Mr. Ali detected "foul earthy odors" while driving along Plainfield Pike sometime between 7:30 a.m. and 8:15 a.m. The same odors were detected again at the intersection of Plainfield Pike and Green Hill Road and along Green Hill Road and Shun Pike. On this day the witness counted nine smoking areas in the storage cells. Attachments 4, 5 and 6 to his affidavit portray the smoke, lack of vegetation and erosion characteristic of the storage cell berms. On that date from an adjoining regulated facility Mr. Ali noted and photographed a four to five foot smoke column rising from the defendants' tailings stockpile. See attachment 8 to his affidavit of October 12, 1995.
The following day, September 22, 1995, Mr. Ali was once again in the field. From the same adjoining facility in the early morning hours he saw the smoking areas in the defendants' tailings stockpile. As he proceeded along Shun Pike he saw at least four smoking areas in the storage area and perceived "burning/earthy odors." On September 24, 1995, in the morning, the witness saw and photographed "heavy smoke" emanating from the storage cells (See Attachment 10) together with the familiar "burning/earthy odor." As he proceeded along Shun Pike he noted six more smoking areas in the storage cell and the usual odors.
The witness substantially corroborated Mr. Hellested's account of the events of September 25, 1995.
September 27, 1995 was another day of morning smoke and odors as usual. Later on that day the witness assisted Mr. Hellested in taking topographical measurements. On October 1 and 2, 1995, the same smoke and foul odors were noted by the witness at the same locations in the same down-wind vicinity of the storage cells.
Although he was subjected to intense cross-examination on December 6, 1995, his testimony regarding his observations in August, September and October were unchallenged.
The plaintiffs next presented the evidence of Kien Harris through affidavits dated September 12 and October 12, 1995, and cross-examination in open court on December 7, 1995. Ms. Harris had been an employee of DEM for nine years at the time of hearing and was then an environmental quality technician in the division of air resources. As of the hearing she had been at the defendants' facility more than fifty times since November 1989.
On Friday, September 1, 1995, she went to the site with Walid Ali, and an air quality engineer from the division of air resources, at approximately 6:00 a.m. As did Mr. Ali, she, too, observed flame, smoke and odors emanating from the tailings stockpile and from the pile in one of the cells. According to her September 12, 1995 affidavit she and the other inspectors attempted to capture air samples from the tailings stockpile between 6:30 a.m. and 7:00 a.m. She reported filling three canisters and three tedlar bags. She attached her log sheet and sample identification sheets to her affidavit. On September 7 and 8, 1995, Ms. Harris and her colleagues collected additional air samples up-wind and down-wind from the storage cells. She also collected samples in tedlar bags at both sites for carbon monoxide testing.
On October 8, 1995 she returned to the area of the defendants' facility and collected up-wind and down-wind air samples from locations adjoining the cells. She brought the test materials to the Department of Health's air pollution laboratory for analysis. This witness was subjected to rigorous cross-examination on December 7, 1995, regarding her collection techniques and her reporting ability. Based on that cross-examination, this Court concluded that her collection and recording technique left something to be desired.
Ms. Barbara H. Morin presented her evidence through two affidavits, dated September 8 and October 12, 1995, with cross-examination on December 7 and 8, 1995 and January 5, 1996 and re-direct examination on January 5, 1996. Ms. Morin has been employed in the DEM division of air resources and at the time of the hearing was a supervising environmental scientist. She is a graduate of Massachusetts Institute of Technology and holds a Master of Science degree in environmental health sciences with concentrations in industrial hygiene/safety and air pollution control from the Harvard University School of Public Health. She has previously qualified as an expert in the field of air toxics in this Court and the United States District Court. Her competence as an expert is not challenged by the defendants.
It was members of her staff who collected air samples on September 1, 7 and 8, 1995, but she did not personally supervise them. According to the witness, however, she analyzed the air pollution laboratory test results only for the samples gathered on September 1, 1995. For reasons best known to the plaintiffs the laboratory test results for those and other samplings were never offered in evidence.
According to the witness nine chemicals, classified in Federal Laws as hazardous air pollutants, "were present in significantly higher concentrations on the [defendants] property than in the up-wind sample." They were claimed to be benzene, toluene, styrene, chloroform, hexane, ethylbenzene, and o-, m-, and p-xylenes. Benzene, which has been classified as a known human carcinogen linked to leukemia, was said to be present in concentrations of 217 and 418 parts per billion in the two samples taken on the defendants, property. The witness characterized this concentration as ten times higher than have been reported in the "approximately 150 ambient air sampling results," that she had reviewed over the eleven years she had been employed in the DEM division of air resources.
The samples of ambient air taken by members of her staff up-wind and down-wind from the defendants, premises on October 8, 1995 and analyzed by the air pollution laboratory disclosed that the down-wind samples were higher in concentrations of total non-methane hydrocarbons than the up-wind. In addition, 55 of the 61 specific organic substances detected in the samples were higher in each of the down-wind collections than in the up-wind.
The witness reviewed the testing of air samples from the Central Landfill over the last five years. She concluded that, "the off-site impact of emissions from the Central Landfill are minimal." Because in no case have sampling results at the Central Landfill shown benzene levels on or down-wind from the landfill been higher than background levels, she concluded that emissions from the landfill did not cause the elevated benzene levels measured on the [defendants'] premises on September 1, 1995.
The plaintiffs next presented evidence from Mr. Peter Alviti, Jr., through an affidavit, dated December 4, 1995 together with attachments, and through cross-examination in open Court on January 5, 1996. Mr. Alviti had been the director of public works of the City of Cranston since 1993. He holds a Bachelor of Science degree in construction technology from Roger Williams College and the same degree in civil engineering from Northeastern University. He is a registered professional engineer in both Rhode Island and Massachusetts.
On August 30, 1995 he visited 15 to 20 residential locations from which he had received complaints of offensive odor. He familiarized himself with the odor. The prevailing wind was flowing in a southeasterly direction, so he traveled in a northwesterly direction to discover the source. He determined that the source of the odors was the defendants' facility, and no other likely odor generator in the vicinity.
On August 31, 1995 he visited the defendants' facility and determined that the particular source of the odors were the three storage cells on the defendants' premises. On that date he established a procedure to respond to the odor problem experienced by residents of Cranston. A twenty-four-hour-per-day hotline was established to receive and record odor complaints. From August 31 to December 4, 1995, 433 complaints were received. Of these, 289 were received as of October 10, 1995 and 169 pertained to the period between September 14 and October 10, 1995.
From his own observations and the record of complaints received by his subordinates he concluded that the defendants' facility was the source of the offensive odors. He specifically pointed to the storage cells, although he acknowledged on cross-examination that he had not viewed the tailings stockpile on August 31, 1995. He described the smell as "unique" and "not emanating from any other facility in the area." He attributed the odor to spontaneous combustion in the storage cells.
The plaintiffs next presented evidence from Bela T. Matyas, M.D., M.P.H., the medical director of the division of disease control of the Department of Health, whose curriculum vitae aptly explains the defendants' concurrence with his competence to testify in the field of environmental health risk assessment as well as community health generally. He identified the fires at the defendants' facility as "the most probable cause of both complaints of certain acute health impacts on residents in the surrounding areas as well as potential exposures to materials which cause unacceptable increases in the risks of certain chronic diseases." The acute health impacts noted by the expert were respiratory irritation and nausea. The exposures responsible for irritation could have more serious repercussions, if continued, including fatality to asthmatics. There is also a potential for fatal consequences from respiratory diseases from prolonged inhalation of irritants present in wood smoke and other types of air pollution.
The doctor dismissed the potential carcinogenicity of the exposures as "not of significant concern" as "a trivial increase in cancer risk" for short-term exposures. He was not so sanguine, however, as to the risks from longer-term exposures.
He concluded: ". . . residents living in close proximity to the Vinagro facility are at risk of exposure to unacceptable levels of air pollutants, and they have complained of adverse health impacts which are consistent with exposures to the fumes and smoke generated at the Vinagro facility."
The defendants have presented no contradictory expert evidence of public health impact from a qualified source.
The chief of the division of waste management of DEM, Mr. Ronald Gagnon, presented his testimony by affidavits, dated September 12 and October 12, 1995, and by extensive cross-examination on January 16, 1996. He also testified in rebuttal through an affidavit dated March 4, 1996, on which he was not cross-examined. The latter testimony will be analyzed when the plaintiffs' rebuttal case is discussed. By the time of the hearings Mr. Gagnon had been in the employ of DEM for 6 years. He held a Bachelor of Science degree in civil engineering from Notre Dame University and is registered in California and Rhode Island as a professional engineer. He had been to the defendants, premises on more than fifty occasions since November 1989.
On August 29, 1995, he visited the site with Mr. Hellested and Mr. Ali. Like them, he observed smoke and odors being emitted from the tailings stockpile, which was separate from the "three stockpiles identified in the operating plans on file with the department." The tailings stockpile was to be covered with clay material "as soon as possible."
The witness concluded from his knowledge of the facility that, "The bulk storage of construction and demolition "materials" in the storage piles on the [defendants] facility generates excessive temperatures and regularly results in smoke and odors being emitted from the facility's three (3) storage cells and the [tailings] stockpile." The witness also testified to procedures which would mitigate and eventually eliminate the smoke and odors from the tailings stockpile. By the conclusion of these hearings the tailings stockpile had been eliminated through normal consumption in the processing stream. It was the witness' opinion that the defendants must be forbidden from ever again developing a tailings stockpile, and should be permitted to have available for processing each day only enough material to be processed on that day.
He also proposed as a remediation for odor and smoke emission from the storage cells that no further material be added to those cells other than cover materials. He recommended that two feet of clean cover material, comprised of earth excavated and transported from an off-site location, be used to encapsulate the three cells, and that the defendants take certain steps to control the smoke and odors with DEM supervision. He identified those steps as "testing, stabilization, re-sloping, implementation of sedimentation and erosion control measures, reduction of volume, reconfiguration, and modification of management." He also suggested that it might be necessary to eliminate the cells completely.
He found that, "For the purposes of removal and disposal of the material contained in the three (3) storage cells, [the defendants] must [re-cover] any area of penetration into the three (3) storage cells by placing six (6) inches of clean cover material on the storage cells, comprised of earth excavated and transported from a location off of the site, at the close of activity on each and every day during which penetration occurs." Finally, he characterized the defendants' then current efforts to control the nuisances a "band aid" approach.
Mr. Gagnon was subjected to extensive and searching cross-examination on January 16, 1996, in which he was never challenged nor was he backed away from his conclusions that the storage cells were the source of the odors creating a nuisance in the area.
Mr. Gagnon drafted the original agreement which was embodied, after revision by his superiors in DEM, in the consent judgment entered on October 5, 1990. Under that consent judgment the defendants were authorized to construct the three storage cells involved in this case. Plans were submitted to DEM for formal review, but the witness does not know if they were approved or disapproved. While no enforcement action was taken against the construction and use of the cells, themselves, according to the witness, DEM has issued enforcement orders regarding smoke emanating from the cells.
He said he did review the plans some time in 1990 or 1991, and from those plans there was supposed to be a top cover of one foot of clean fill. Each cell was to be fully capped when it was filled. He also acknowledged that he, too, was familiar with the activity involved in the tailings stockpile.
On re-direct examination the witness testified that the slope of the exterior of the berm was required to reduce erosion. The failure to maintain the required slope resulted in erosion plainly apparent in the photographs. The height of the berm was required to limit the capacity of the cells. An increase in the height of the berm walls from ground level could increase the holding capacity of the cells, but the witness could not say if the volume of the cells had, in fact, been increased. The missing vegetative cover on the exterior slope facing the town roads was designed for both esthetic reasons and to control erosion. Although he was critical of the use of wood chips by the defendants to control erosion, he acknowledged that a DEM handbook recognized wood chips as an organic mulch, but only on a temporary basis. He insisted, nonetheless, that for these defendants vegetation was required for erosion control.
Finally, the plaintiffs concluded their direct evidence in their case in chief with the affidavit of Robert Caliguri dated September 22, 1995. The witness had been employed as a truck driver for approximately one year by R S Construction Co., whose business abuts the defendants' facility. He testified that during the course of his employment on his employer's premises he has frequently observed "smoke and/or smoke odors emanating from the defendants" facility. On occasion, when I have returned a truck to R S late at night "approximately 1:00 a.m. to 2:00 a.m.), R S has been covered with smoke that has been so thick it looks like fog."
He had also seen flames "shooting out" from the defendants' stockpiles. He reported that on August 13, 1995 the flames he observed were so serious that he reported a fire, to which the Johnston Fire Department responded. The witness was cross-examined closely on January 18, 1996, but his credibility was not significantly impeached.
The Defendants' Case in Chief
The defense began its case in chief on February 5, 1996 with the affidavits, and attached exhibits of Louis Vinagro, Jr., dated October 11 and 12, 1995. Mr. Vinagro was cross-examined on February 5, 6, 7, 8, 15 and 29, and March 4, 1996. Mr. Vinagro was an expansive and sometimes hostile witness on cross-examination. He resisted straight-forward responses to simple and direct questions. He had a tendency to ramble irrelevantly. He appeared generally to want sincerely to be cooperative and helpful to the Court, but he could not always resist the temptation to go off on tangents. His good efforts to be as honest and truthful as possible were plain to see. He honestly believes that, having done nothing wrong, he is the victim of a conspiratorial plot to put him out of business. He generally feels that he has done everything reasonable that the regulators have asked him to do. He reflects a sincere pride in his recycling business, which he regards as innovative. He sees himself as free enterprise's contribution to environmental control through waste recycling
He claims that the October 5, 1990 consent judgment was permission to construct the three storage cells, which would have the "very unique feature" of having one (1) year's processing capacity. By that, he explained, he meant that construction and demolition material would decompose for at least one year in the cell, before it would be withdrawn for further processing. He claims he made "several major business decisions" in reliance on that permission. The plaintiffs cannot validly dispute that assertion.
That one year storage capacity allowed his facility to accept a continuous intake of material, so his suppliers could rely on a steady acceptance of their material. That capacity also allowed him to respond to fluctuations in the market for his processed materials, such as processed wood and soil products. He could now, he said, serve two different markets: one for processed "clean" wood and another for processed construction and demolition material.
He accomplished this result through three separate processing "trains," or streams. First is what he calls the wood recovery system, in which the wood included in construction and demolition material is allowed to biodegrade in the cells, after which it is processed into soil products. The second is the processing of "clean" wood into wood chips. The third stream consists of wood removed from debris material before it is placed in one of the storage cells. Incoming materials are analyzed, as received, for their proportionate contents. Those which contain significant proportions of wood, or which contain principally "clean" wood, are sorted, and the wood processed into a "wood chip based recyclable end product." Those, in which there is a high percentage (more than 30%) of recyclable material other than wood, are destined for the storage cells and processing into other end products. According to the witness, he can thereby respond to fluctuations in the end product market he serves by balancing the demand for his wood chip production against that for his soil production.
He also states that he relied on the October 5, 1990 judgment in purchasing equipment based on a one-year storage capacity. Different equipment, he contends, would be needed to service material subject to shorter turn-over times. Mr. Vinagro claims that his recycling activity is a legitimate response to a public problem of disposal of solid waste. He claims that he ships out more material than is received at his facility.
Responding to the smoke and odor complaints, Mr. Vinagro points to three pig farms, two dairy farms, two cesspool companies, five composting facilities, another word recovery facility and at least eleven waste hauling facilities, as well as other businesses, all of which generate odors in the vicinity of his facility. The defendant understandably identifies the Central Landfill as a prime source of odor. Several greenhouses and other wood burners in the area generally are blamed by this defendant as sources of smoke. On an optical and olfactory "view" the Court observed and smelled some of these locations, including the Central Landfill, on two visits to the area and the defendants' facility. The Court is frank to say that the optical view was more rewarding than the olfactory one in understanding the evidence.
He claims that, although he had been using the three storage cells for approximately four years, DEM had not found a single violation for odor problems, except for an odor from fish and composting which he says have been corrected pursuant to a consent agreement with the department. He also explained that recently he had been compelled to increase the tonnage of material in the tailings stockpile, which had exceeded three cubic yards on many occasions. This excess he says had never been cause for a notice of violation by department inspectors. He acknowledged that material withdrawn from a storage cell and deposited in the tailings stockpile has an odor, but asserted he intended to phase that stockpile out completely by November 10, 1995, or to reduce it by then to previous non-offensive levels. As has already been pointed out he was not successful until mid-December 1995.
The defendant insists he has had a comprehensive fire contingency plan, officially approved by DEM, in place since November 1991. He claims he has 24-hour surveillance by a security force, which is specially equipped and instructed to watch out for any indications of "hot spots," in which some of the earthen cover over the cells may have "slid away," thereby letting oxygen into the decomposing material. He further insists that the fire prevention procedures, so put in place and approved by DEM, have been in place for nearly five years, "with little or no complaints about smoke or smoke odors."
Mr. Vinagro concluded his affidavit testimony by attributing neighborhood complaints of smoke and smoke odors to his tailings stockpile along with other sources in the area. The affiant furnished a collection of photographs of a number of these sources, taken either in Spring or Fall 1995, showing each of them generating a white plume into the atmosphere.
On cross-examination Mr. Vinagro asserted that if he were not permitted to operate the three storage cells with composting for at least one year he would lose the value of most of his investment in equipment as listed in the affidavit of Thomas Nicholson. He later said that if he were required to change to a three month turn-around of construction and demolition material he would need the use of only approximately 25% of his equipment.
He acknowledged that the consent judgment of 1990 was in part an attempt to resolve a fire problem in 1990 in an "original existing stockpile." He also acknowledged that the security force mentioned in his affidavit had been laid off, and that he and his sons were providing their own security.
He testified that he had consulted with Mr. Nicholson regarding the fire potential during the Summer of 1995 and regarding the erosion problems on the site.
There had concededly been an odor problem in the area for years, for which his place was responsible in part. Also, there had been more than usual smoke and steam emanating from the tailings stockpile. Once again, he referred to a "small" smell from material excavated from the storage cells, but he said it was "a lot less" than what comes from Central Landfill.
The witness contended that what observers had seen in the storage cells was steam, not smoke, coming from "hot spots." He firmly disagreed that any smells were emanating from the cells.
In order to counter the assertion in the witness' affidavit that there had been no complaints of smoke or odors while the storage cells were in use, the plaintiffs confronted the witness with a series of official reports and documents. The witness was shown a departmental NOVAP (Notice of Violation and Order and Penalty) dated September 10, 1993, number SW-93-26. That NOVAP ordered the defendant to submit a remediation plan and report concerning smoke and odors from "the demolition stockpile;" to cease accepting demolition material in the storage cell then employed and not to maintain more than three months, design processing volume; immediately to cease excavating material from the storage stockpile; and to cover the storage cell with twelve inches of clean soil. The evidence disclosed that this notice was resolved at the hearing stage by a consent agreement entered into on November 1 and 2, 1994, containing a single reference to the "construction demolition storage cells" permitting the temporary storage of wood chips on the cells after the existing compost facility had been relocated.
In 1993, the following smoke or odor complaints were noted by inspectors from DEM. On February 26: "Investigate use of geomembrane for daily cover of stockpile excavation." "Stockpile to be covered, deodorizer to be used." On March 3: "Investigate use of geomembrane for excavation cover." On April 7: "I observed couple smoking spots on the site." On July 15: "I observed couple smoking spots on the subject site. The smoking spots were covered by dirt while I was on site." On August 30: "I observed smoke coming from the edge of the new stockpiles next to the berm." Although early smoke and odor references prior to this one could relate to the so-called "old stockpile," this one expressly relates to "the new stockpiles." It is also noteworthy that in the August 30, 1993 field inspection report the inspector observes that, "The old stockpiles are approximately removed." On September 10: "I detected an earth (sic), wood odor on the top of the construction and demolition waste stockpiles." On September 30: "I observed couple smoking spots on the N[orth] part of the stockpiles. Mr. Vinagro told his workers to cover the smoking spots with dirt immediately." On October 13: "At the time of the inspection I observed couple smoking spots on the Northern part of the stockpiles." On December 22: "I observed (3) smoking areas at the construction and demolition stockpiles." A representative of the defendant wrote the word "steam" over the word "smoking."
The 1994 inspection reports disclose the following regarding smoke and odors. On February 28: "Earthern (sic) smell was detected on the subject site and Green Hill R[oa]d." On March 28: "At the top of C D stockpiles, I noted smoke coming out of the edge of berm. I detected smoke and wood odor at the top of C D stockpiles." Once again the defendants' representative twice prints the word "steam" where the word "smoke" is written in the report. No comment is made regarding the "wood odor." On June 24 "I noted smoke emitted out of the excavati[on of] C D stockpile area." The defendants' representative has lined-out the word "smoke" and printed the word "steam" in the report On August 11: "I noted smoke at the excavation area. I detected wood and composting odors at the site." Once again, the defendants, representative prints the word "steam" in parentheses over the word "smoke." On August 19: "I observed a (sic) smoke in an excavated area and emanated (sic) from the excavated wood in the bucket of the buldozer (sic). I detected a composting and earthy smell next to the windows. (2) piles of construction wood debris were noted at the top of C D stockpiles." The usual word "steam" is written in by a representative of the defendants over the word "smoke."
Documents from 1995 disclose the following from inspection reports. On January 24: "I noted the excavation area where heavy steam with wood odors were detected." On January 30: "I inspected the C D debris stockpile[. H]eavy smoke was coming out of the excavated material. Johnston Fire Dept. will be contacted to verify if the outcoming (sic) of the C D debris is smoke or steam." On February 15: "At the time of the inspection heavy smoke was noted at the excavated areas. I detected an earthy smoky wood odors (sic) at the facility." As usual the defendants' representative wrote in "steam" over the word "smoke" in the first sentence, but made no comment about the "smoky wood odors." On February 24: "The wind was blowing toward the north east. At the north east side at top of the berm I detected burning odors and wood earthy odors." On March 9: "I noted different spots with smoke ("Steam," say the defendants) emitted out of it (sic) . . . I detected earthy and woody odors at the facility." On April 21: "Steam was emitted out of the excavated construction and demo materials." On May 4: "Couple smoking ("Steam," say the defendants) spots were noted at the excavated area. I detected earth woody odors at the facility." On May 18: "4.03 — odors migrating off site." On May 26: "I noted smoke ("Steam") smothering (sic) during the excavation at the construction and demo storage cell. I detected smoke odors (No "steam") next to the buldozer (sic) operating at the C D stockpile storage cell." On June 1: "I detected an earthern (sic) smell next to the berm." On July 14: "Couple steam spots were covered with gravel at the time of inspection." Next day, July 15: "I observed couple smoking spots on the subject site. The smoking spots were covered by dirt while I was on site." Apparently, this smoke originated from the tailing stockpile and not the storage cells. On July 26: "I detected an earthy smell next to the C D debris cells. Deodorizing system operation was increased." On August 22: "The earthy woody smell was detected at the facility."
On August 22, 1995, pursuant to the observations of August 11, 1995, in which DEM personnel observed heavy smoke smoldering from the north east portion of the construction and demolition debris stockpiles and detected objectionable odors beyond the defendants, property line, the defendants were sent a letter of deficiency by Mr. Gagnon. The letter noted violations of Rule 4.03 (a) and (c) of the Rules and Regulations for Solid Waste Management Facilities prohibiting open burning and emissions of objectionable odors beyond the facility's property line.
Further during his cross-examination, Mr. Vinagro conceded that there was no vegetation on the slopes of the berm which he accounted for by the changes in those slopes. Those changes increased the slope beyond the one for two ratio because of the increased fill he claims he was required to put on the berms by the department.
A considerable portion of the cross-examination of Louis Vinagro, Jr., was taken up by consideration of the defendants' recycling business. According to the defendants' records during 1995 they "processed" 200,202 tons of material from the storage cells, while they received only 110,199 tons. Of the 200,202 tons of processed material, however, 104,630 tons were used to re-slope the berms, 68,332 tons were stored on other land of Louis Vinagro across Green Hill Road from the facility, and only 41,468 tons were sold. By far the largest quantity of recycled material produced and sold by the defendants has been what they classify as "loam, fill, compost." Wood chips, paper and cardboard, and metals comprise a much smaller quantity by tonnage of recyclable material sold from 1990 to the present.
Converted to dollars in terms of "tipping fees" and sales of recycled product, a different, if obscure, picture emerges. While demolition debris constituted 63.07% of all tons received at the facility from all sources from 1990 through January 1996, tipping fees, shown as "sales in," represented 58.54% of receipts during the same period, or $20,128,073 out of $34,380,960 from all sources. (See page 93 of Plaintiffs' Exhibit 20.) Processed materials from the storage cells, shown as "dirt/stone," represented 50.16% of output by tonnage for the same period, but accounted for only 14.54% of sales for the same period at $359,592, far behind sales of metals, cardboard, and "mothers" product. (See page 96 of Plaintiffs' Exhibit 20.) It is clear, based on the defendants' own business records, that receiving the material stored in the storage cells is far more valuable to the defendants than the sale of recycled product.
The witness avowed that he had last excavated material from the storage cells in October 1995, and that he would begin mining one of the cells as soon as the weather permitted, which on March 4, 1996, he estimated to be in a couple of weeks.
Another principal witness for the defendants was Thomas B. Nicholson. His testimony was presented through four affidavits, respectively dated October 12, with attached exhibits, and October 30, 1995, and January 16, and March 11, 1996, with attached exhibits. Mr. Nicholson was cross-examined on February 12 and 14, 1996.
Mr. Nicholson is a professional civil engineer, registered in Rhode Island, Massachusetts and Connecticut. He holds a Bachelor of Science degree in civil/environmental engineering from Northeastern University and a Master of Science degree in environmental engineering from Worcester Polytechnic Institute. He is the managing engineer of the environmental/planning division of Pare Engineering Corporation (PARE), of Lincoln, Rhode Island, where he has been employed for approximately 9 years. Previously he had been employed as an environmental engineer in private industry for approximately 8 years.
The witness has been involved in numerous projects relating to solid waste management and related environmental engineering projects. He has been involved in the design of sanitary landfills in Cranston, Bristol and Tiverton, as well as solid waste transfer stations in Cranston and Thompson, Connecticut. He has been involved in more than fifty separate evaluations related to environmental site contamination. In addition, he has been involved in several air pollution assessment and mitigation projects, including evaluating the impacts of airborne particulates from a C D recycling facility in East Providence, and the abatement of odors arising from sewage disposal facilities in Bristol. He has qualified previously in this Court as an expert in environmental engineering, solid waste management, hazardous material contamination, water quality protection and ground water protection. His competence as an expert witness was not challenged by the plaintiffs. The Court finds his credentials to be impeccable.
Since 1986, Mr. Nicholson has been project manager and chief liaison for PARE in providing engineering services for the defendants. Over that period he has visited the site regularly.
According to the witness the three earthen-bermed construction and demolition debris cells employed by the defendants incorporate tried and true methods utilized for years in solid waste landfills to safely store such material. This method of storage reduces the risk of fire by preventing air flow through the material and by limiting accessibility to vandalism. He pointed out that this storage method was subject to a Fire Control and Contingency Plan approved by DEM.
Mr. Nicholson acknowledged the problems of fire and odor associated with open storage of debris in the tailings stockpile. He agreed with a requirement of prompt removal of that stockpile, which he expected to be eliminated by the end of October 1995. His opinion seems to be that the problems arising from the tailings stockpile could have been remedied without any need for judicial interventions.
According to the witness the heat of decomposition of material in the storage cells can and does cause the venting of steam, which can appear to the untrained eye as smoke. He points to the reports of Mr. Walid Ali, in which Mr. Ali sometimes describes the substance emitted as steam and at other times as smoke, as if he didn't know the difference.
A considerable portion of the witness' initial affidavit must regrettably be disregarded as purely argumentative. Virtually all of three paragraphs on page 5, are simply arguments that Walid Ali and other witnesses were mistaken in their observations of smoke and odor from the cells, at a time when the witness was not present to contradict their observations. His contention, in part D at page 6 of his initial affidavit, that the site is not a construction and demolition processing facility, as defined in G.L. § 23-19.9-7, whether he is right or wrong, is plainly not within the purview of his expertise, but is rather a complex question of statutory construction to be decided by the Court later in this decision.
The defendants have invested $6.7 million according to Mr. Nicholson in equipment described by him as "specifically tailored to the cell storage C D recycling operation," a list of which was attached to the witness' initial affidavit.
The testimony of Mr. Hellested and Mr. Ali that on August 29, 1995 they observed smoke emanating from a storage pile of wood is to some degree contradicted by the witness' evidence that on September 11, 1995, some 13 days later, he observed burnt wood chips on the Liberty Disposal property abutting the defendants' land, which he conjectured was the source of the smoke and odors observed by the DEM staffers. However valid his later critique may be of the surveying techniques employed by Mr. Hellested and Mr. Ali on September 27, 1995, he does not, and cannot dispute the obvious fact that the slopes of the berms exceed 2:1, they are more than 40 feet high, they lack vegetative cover on their street sides, and they are eroded in a number of places. Mr. Nicholson points out accurately that the one-foot cap on the cells shown in the drawing attached to Mr. Hellested's affidavit of October 12, 1995 was to be installed in conjunction with a composting system in windrows on the top of the cells, which was discontinued pursuant to a consent agreement between the defendants and DEM in 1994. The witness insisted that a wood chip cover has been allowed on top of the storage cells as a standard procedure for the past four years.
Much more serious than his petty objections to the physical observations and measurements by DEM staffers are his serious and valid critiques of the air sample collection by Ms. Harris and her colleagues. Her logs are nothing if not sloppy. The collections were one-time, one-place collections called "grab" samples by Mr. Nicholson, and not annual averages. There is no accounting in the sampling for other sources of airborne pollution. Also, no reasonable opportunity was afforded to the defendants to obtain their own simultaneous sampling and testing of the ambient air. In addition, benzene, identified as the principal chemical air pollutant generated at the defendants' facility has been regularly measured in far greater volume at the Central Landfill. Under these circumstances, the evidence from Ms. Morin and Dr. Matyas regarding the carcinogenic potential, if any, from airborne benzene generated at the site is worthless. It is noteworthy that the plaintiffs have ultimately decided not to request any findings with respect to any area air pollution other than that arising from smoke and odors.
Mr. Nicholson was also highly critical of Mr. Hellested's sample collection technique when on October 18, 1995 he gathered "grab" samples of wood chips used as cover on the defendants' storage cells. In this regard, of course, because the wood chips were openly and readily available on site before and after the plaintiffs collected their samples, the defendants could have made a proper collection, using valid collection and testing techniques, unlike the various air collections. Air moves fairly readily; wood chips probably do not. In addition, Mr. Hellested simply cited the "spot" test result as being only valid cause for concern by DEM. Mr. Nicholson does not dispute that fairly mild conclusion.
It is difficult to understand why the witness did not comprehend allusions during the hearing to the capacity of human olfactory sensitivity to detect odors at thresholds well below test capacity to determine the cause of the odors. This witness also concedes that as late as November 11, 1995 the offensive tailings stockpile still had not been eliminated.
This witness, however, plainly eliminated the site as a source of carbon monoxide and gaseous oxides of nitrogen as polluting by-products from combustion.
The Rebuttal Evidence
Finally, the witness utterly dispelled in his March 11, 1996 affidavit, any inference to be drawn from Mr. Gagnon's March 4, 1996 rebuttal affidavit that the smoke source was spontaneous combustion from heat of decomposition with material stored inside the cells. The Court concludes that the debris stored in the cells may be ignited by other means than heat from organic decomposition.
IV.
FURTHER FINDINGS OF
FACT FROM DISPUTED EVIDENCE
From all the evidence presented at extended hearings and drawing reasonable inferences from that evidence, this Court makes the following findings of fact:
1. The excavation of decomposed construction and demolition debris from the storage cells causes the emission of smoke and offensive odors.
2. The defendants intend to resume and continue excavating construction and demolition debris from the storage cells without precautions to prevent or eliminate the emission of smoke and offensive odors.
3. The failure to cover or cap the top of the storage cells with a sufficient depth of impermeable non-organic material has allowed the emission of smoke and offensive odors from the storage cells.
4. The failure to conform the configuration of the berms to the original design plan in reference to the degree of slope of the exterior surface and the failure to cover these slopes with live vital vegetation has caused erosion in these slopes which permits the escape of smoke and offensive odors from the cells.
5. Smoke and offensive odors emanating from the storage cells has crossed the boundaries of the defendants' premises and invaded the neighborhood around the defendants' premises.
6. The storage cells may not be the only source of neighborhood smoke and offensive cells, but their contribution is substantial and serious.
7. The emissions from the defendants' facilities have not been shown to violate any air quality standards other than those for smoke and offensive odors.
8. Several residents of nearby areas of the City of Cranston and the Town of Johnston have experienced physical symptoms such as nausea, headache, burning eyes and throat, and sleep disturbance due in substantial part to exposure to smoke and offensive odors emanating from the use by the defendants of the storage cells.
9. During the periods of smoke and offensive odor generation by the defendants' activities, several such residents have been deprived of their accustomed enjoyment of their real property.
10. There is not sufficient evidence to draw any conclusion regarding a risk of major fire from the operation and maintenance of the storage cells.
11. The tailings stockpile, so-called, as maintained by the defendants until December 1995, caused the emission of smoke and offensive odors on the defendants' premises.
12. These emissions of smoke and offensive odors were not contained on the defendants' premises but escaped with persistent regularity into the surrounding neighborhood.
13. Even though it was a substantial contributing source of neighborhood complaints of smoke and offensive odors, it was not the sole such source.
14. Even though the existing tailings stockpile was eliminated by December 1995, the defendants claim that they can resume storing incompletely processed construction and demolition debris in the open out of the storage cells for more than one day.
15. A major portion of the defendants' income related to the processing of construction and demolition debris comes from the fees it charges generators of that debris for receipt into the storage cells, called "tipping" and handling fees. The sale of recycled material from the storage cells after processing has not been a significant source of income.
16. The storage cells are substantially landfills, or solid waste management facilities.
V.
THE LEGAL ANALYSIS
Among the awesome responsibilities of the Attorney General is that of prosecuting a public nuisance at common law and underG.L. 1956 (1985 Reenactment) § 10-1-1, which codifies the common law power and duty. A most recent elaboration of the common law of nuisance has been expounded by our Supreme Court inCitizens for Preservation of Waterman Lake v. Davis, 420 A.2d 53, 59 (R.I. 1980). In that case the nuisance alleged was the pollution of Nine Foot Brook, and other waters, ponds, and marshes lying below the defendants' dump site and the noise generated by the trucks hauling refuse to the dump site. After holding that neither the citizens group nor the Town of Glocester had standing to enforce the State Fresh Water Wetlands Act (G.L. 1956 §§ 2-1-18 to 2-1-25) and that the Town could not enforce its refuse ordinances in equity in this Court, the Supreme Court considered the plaintiffs' claim that the defendants were guilty of nuisance. The Court said:
 "Actionable nuisances fall into two classifications, public and private. A private nuisance involves an interference with the use and enjoyment of land. It involves a material interference with the ordinary physical comfort or the reasonable use of one's property. (Citation omitted). A public nuisance is an unreasonable interference with a right common to the general public: it is behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community. (Citations omitted). The burden of proving a nuisance is upon the party alleging it, (Citations omitted), who must demonstrate the existence of the nuisance, (Citations omitted), and that injury has been caused by the nuisance complained of, (Citations omitted).
 "Noise (in our case read "odor" in and of itself can be a nuisance only if it unreasonably interferes with a persons use and enjoyment of his property. (Citation omitted). The law does not attempt to impose liability in every case in which one person's conduct has some detrimental effect on another. Liability is imposed only in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances. 4 Restatement (Second) Torts, § 822, comment g., at 112 (1979)." 420 A.2d, at 59.
The defendants derive their authority to construct and use the storage cells from a consent judgment of this Court. New England Ecological Development, Inc., holds a license from DEM to operate a transfer station/wood recovery solid waste management facility. The storage cells are ancillary to the licensed wood recovery facility. The storage cells are not separately licensed under any provision of the State Refuse Disposal Act (G.L. (§23-18.9-1, et seq.). As an ancillary facility to the licensed facility on the same site they are obviously subject to the same regulatory oversight as the main portion of the facility at the so-called transfer station and the wood recovery facility.
Historically, the facility has had difficulties arising from exposed stockpiles of construction and demolition debris awaiting processing in the wood recovery facility. In 1990 there was a fire problem from what was described as the "original existing stockpile," which was not fully eliminated until 1993. The storage cells were designed, in part, to meet some of the problems arising from the open-air stockpiling of unprocessed construction and demolition debris. The creation of the "tailings" stockpile in 1995 led to the problems which triggered the initiation of this lawsuit.
Clearly then, the open storage of construction and demolition debris has been prohibited both under the license and by implication in the 1990 consent judgment. The maintaining of open stockpiles of unprocessed construction and demolition debris, especially if it contains partially decomposed, or rotting, organic material is a public nuisance because of the plain risk of fire, smoke and odors. The pollution of the environs of the defendants' facility during the Summer of 1995 is an olfactorily graphic demonstration of the validity of such a conclusion.
The storage cells plainly do not fit the statutory definition of a "construction and demolition debris processing facility," because they receive more than one hundred fifty (150) tons per day, far less than seventy-five (75%) of the recyclable material received is processed and removed from the site within six weeks of receipt on a continuous basis, and material is stored on site for over three months. The plaintiffs' efforts to require that the defendants somehow bring these cells into compliance with the definition of a statutory "construction and demolition debris processing facility" is unavailing. If the General Assembly had intended to forbid the receipt and processing of larger quantities of debris or storage for periods longer than three months, it clearly did not do so by this legislation. A careful reading of § 23-18.9-8(c) seems to imply that facilities accepting more than one hundred fifty tons of construction and demolition debris are not exempt from obtaining a full "solid waste management facility" license. The defendant New England Ecological Development, Inc., holds such a license for its transfer station/wood recovery facility. As the court has pointed out, the storage cells are ancillary to, and an integral part of the licensed facility, and are maintained and permitted by that license and the consent judgment.
The consent judgment also specifically permits storage of one year's processing capacity in each of the three cells. The system described in the evidence is that during a given year the defendants excavate one cell for processing, fill one cell with debris as received and sorted, and allow one cell to decompose. The debris in a cell when it is opened for excavation can be up to two years old. The operating plan as approved by DEM, permits receipt of up to five hundred (500) tons of debris per day.
Although the cells are a permitted method of stockpiling of unprocessed construction and demolition debris, and, even if they are not, in and of themselves, a "construction and demolition debris processing facility," as defined in G.L. §23-18.9-7(8), as amended by P.L. 1994, ch. 212 § 1, they can still be found to be a public nuisance because of the manner in which they are maintained.
This Court has found from conflicting evidence that the storage cells emit smoke and offensive odors which have contributed in substantial part to cause residents of surrounding areas to lose substantial enjoyment of the impeded use of their real property.
The plaintiffs call the Court's attention to persuasive precedent from Pennsylvania. The state there claimed that an acid discharge from a closed and flooded mine was a common law nuisance in addition to being a violation of regulatory statutes. The trial court dismissed all claims, but, on appeal the Supreme Court reversed the dismissal of the statutory and common law claims of nuisance and remanded the case to the trial court for a hearing on relief. Commonwealth v. Barnes Tucker Co., 455 Pa. 392, 319 A.2d 871 (1974). The Pennsylvania Supreme Court there held that the statutory failure to forbid the discharge of the pollutants did not immunize the respondent from liability for a common law nuisance. On remand the trial court ordered the respondent to remedy the condition and abate the nuisance, at its own expense. Commonwealth v. Barnes Tucker, Co., on remand,23 Pa. Commw. 496, 353, A.2d 471 (1976), Aff'd, 472 Pa. 115,371 A.2d 461 (1977), app. dism, 434 U.S. 807, 98 S.ct. 38, 54 L.Ed.2d 65 (1978).
The Court is satisfied that the cells, themselves, if constructed and configured in accordance with the approved design, and, if appropriately covered during periods when excavation and filling are not being carried on, will not be public nuisances. According to the evidence, which this Court finds credible, smoke and odors are escaping from fissures in the berms caused by erosion. Smoke and odors are emanating from exposed debris in the open cells during and between excavating and filling operations.
CONCLUSIONS OF LAW
From the foregoing facts, which are either undisputed or have been found by the Court from the evidence, the following conclusions of law arise.
1. The creation, maintenance and use of the tailings stockpile constituted a public nuisance because of the smoke and offensive odors it generated into the surrounding neighborhood.
2. The tailings stockpile was an unlicensed landfill.
3. The tailings stockpile violated departmental rules and regulations regarding open burning of solid waste.
4. The tailings stockpile was the source of repeated violations of G.L. § 23-31-1, et seq. by emitting airborne contaminants, such as smoke, which unreasonably interfered with the enjoyment of life and property.
5. The tailings stockpile violated departmental regulations by emitting, or causing to be emitted into the atmosphere, contaminants which create an objectionable odor beyond a property line of the defendants' premises.
6. The tailings stockpile was not a nuisance in and of itself.
7. The defendants must be prevented from ever again storing or keeping construction and demolition debris in the open for more than a few hours.
8. The defendants must permit inspection without time or notice limitations by representatives of DEM at any time they have construction demolition debris on their premises.
9. Excavation of decomposed construction demolition debris from the storage cells constitutes a public nuisance as presently conducted by the defendants because of the smoke and offensive odors generated thereby into the surrounding neighborhood.
10. The defendants have failed to comply with the Consent Judgment entered in this Court on October 5, 1990 in Civil Action Number PC 90-5535 in that they have failed to maintain a vegetative cover on the exterior slopes of the containment berms around the storage cells, and they have failed to maintain to outside slopes of the berms at an angle no steeper than one foot of rise per two feet of base, and they have routinely used combustible wood chips as a cover over the contents of the cells.
11. The continued maintenance and use of the improperly constructed storage cells such that they emit smoke and offensive odors into the neighborhood constitutes a public nuisance.
12. The nuisance so created and constituted must be abated promptly at the expense of the defendants.
Accordingly the Court will grant the plaintiffs the following interim relief:
1. The defendants will be permanently enjoined from stockpiling any construction and demolition debris prior to processing anywhere on their premises other than in the storage cells.
2. Materials for processing will be transported directly from the storage cells to the processing facility and will be fed directly into the processing stream from the transporter.
3. The defendants will be permanently enjoined from using wood chips or any other organic material for covering the tops of the storage cells.
4. Each storage cell will be topped with a layer of fresh virgin non-organic soil or clay to a uniform depth of at least one foot over all surfaces not being actively filled or excavated.
5. The defendants will cover all exposed construction and demolition debris in the storage cells during periods of each day when the cell is not being actively filled or excavated, respectively. The nature and extent of that cover will be determined by the division of waste management of DEM, subject to approval by the Court.
6. The defendants will permit inspection and monitoring by DEM at any time while construction and demolition debris is on their premises. Inspectors and monitors need not announce their visits, nor do they need to make prior appointments. No representative of the defendants will be required to accompany DEM inspectors.
7. The defendants will commence forthwith to close up all fissures in the berm walls so that no smoke or steam is permitted to emerge.
8. The defendants will forthwith bring all berm walls of the storage cells into conformance with the Consent Decree of October 5, 1990, with supervision and approval from the division of waste management of the DEM.
9. Neither G.L. §§ 23-18.9-11 nor 23-23-10 provides for an award of counsel fees or costs other than the usual costs of litigation, which the plaintiffs may have.
10. This Court will retain jurisdiction of this case to provide for implementation, clarification and enforcement of this order, as circumstances may require.
The plaintiffs will present a judgment, pending further Orders of the Court, for entry on notice to the defendants.